**SCHLEIER LAW OFFICES, P.C.**
3101 N. Central Avenue
Suite 1090
Phoenix, Arizona 85012
Telephone: (602) 277-0157
Facsimile: (602) 230-9250

TOD F. SCHLEIER, ESQ. #004612
Tod@SchleierLaw.com
BRADLEY H. SCHLEIER, ESQ. #011696
Brad@SchleierLaw.com

*Attorneys for Plaintiff Joseph A. Sparks*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Joseph A. Sparks, is a married person, | )<br>) |
| Plaintiff, | ) No.<br>) |
| v. | ) **COMPLAINT**<br>) |
| Hub Group, Inc., a Delaware corporation, | ) (Demand for Jury Trial)<br>) |
| Defendant. | )<br>)<br>) |

Plaintiff, by and through counsel, for his Complaint against Defendant, alleges:

### I. NATURE OF CLAIM

1. This is a proceeding for damages against Defendant Hub Group, Inc. to redress the deprivation of rights secured to Plaintiff by the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621, *et seq*.

## II. JURISDICTION

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 and pursuant to the Age Discrimination in Employment Act of 1967 (ADEA), as amended and modified, 29 U.S.C. § 621 *et seq*.

## III.   VENUE

3. Based on 28 U.S.C. § 1391 and the ADEA, venue is proper because the acts detailed in this Complaint occurred within the State of Arizona and the jurisdiction of this Court.

## IV. PROCEDURAL REQUIREMENTS

4. On March 26, 2019, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") complaining of age discrimination. On November 22, 2019, the EEOC issued a Notice of Right to Sue to Plaintiff. This action has been filed within ninety (90) days after Plaintiff received his Notice of Right to Sue and Plaintiff has therefore satisfied all procedural requirements necessary to bring this action.

## V. PARTIES

5. Plaintiff Joseph A. Sparks is a male over the age of 40 who was employed as a sales person with Defendant Hub Group, Inc. ("Hub") from about July 2017 up to his termination on November 15, 2018. At the time of his termination, Plaintiff was 63 years old.

6. Defendant Hub Group, Inc. is a Delaware corporation and an "employer" with respect to the ADEA.

## VI. FACTUAL BACKGROUND

7. Plaintiff Joseph A. Sparks ("Sparks") worked as a salesperson with Estenson Logistics, LLC ("Estenson") from about December 7, 2005 through 2017 as one of its salespeople and reported directly to one of the owners, Tim Estenson.

8. Estenson provided Dedicated Logistics services supplying trucks, drivers and product transportation management to various companies such as Home Depot, Walmart, etc.

9. Plaintiff worked with Estenson for nearly thirteen years from 2005 through 2017 and excelled in his sales performance expectations. In 2017 Estenson's revenue was approximately $275M, of which 80-90% was the result of Plaintiff's sales activities, and the company was highly profitable.

10. On about May/July 17, 2017, Estenson was sold and acquired by Defendant Hub for approximately $250M. The Hub Group did not have a dedicated product line division.

11. Mr. Tim Estenson was retained as the President of the Hub Group Dedicated division.

12. Plaintiff was also retained and given the title of Vice President of Sales for Hub Group Dedicated and continued in his sales role reporting directly to Mr. Estenson.

13. All retained Estenson employees were "grandfathered" into Defendant Hub in terms of tenure and benefits.

14. Mr. Estenson expressed Hub's confirmation to Plaintiff that Hub would also grandfather Plaintiff's Estenson compensation until Plaintiff quit or retired.

15. Plaintiff was offered to continue with his same direct sales position or work with training a sales group of about fifty people and receive bonus compensation based on their success. Hub had about fifty-six full time salespeople. Plaintiff chose to remain in his sales position with the same compensation structure.

16. With the assistance and guidance of Mr. Estenson, Plaintiff did conduct several training sessions with Hub's sales group people to help them identify prospects and the value of the dedicated logistics industry.

17. On about August 28, 2017 Plaintiff signed a non-compete agreement with Hub Group in exchange for Hub stock, approximately 3,400 shares with 5 year vesting. Plaintiff sold 20% on first year anniversary.

18. On about October 5, 2017, Mr. Estenson emailed Plaintiff with Hub's promises of compensation for Plaintiff's future employment with Hub as follows:

> Surviving the day. Their view of pay is much different than mine.
> They actually had examples of Hunts, Cardinals, Schneider's, and Werner's.
> Pays average between them is a base of $140,000.00 and commission on a average year of about $60,000.00 to $100,000.00
> <u>They did agree to grandfather your current program like I have been discussing with you until you retire. Big big big win</u>.
> Details around dual calls are the same as we discussed as well, you will get a $1,000.00 a truck on a deal a HUB Rep brings to the table.
> So you should be in a great position. Now all we need to do is start delivering new deals.
> Have a good night.

19. Plaintiff continued to excel in his sales and on about February 1, 2018**,** Mr. Don G. Maltby, Hub's President & COO recognized Plaintiff's outstanding sales achievements as Plaintiff had been awarded , "Joe Sparks Wins Vendor Salesman of the Year 2017," for one of Hub's main customers. Plaintiff had over $30M in his YTD sales.

20. Plaintiff's 2017 sales achievement was outstanding in the industry and Plaintiff's best sales year of his career.

21. Plaintiff planned on working until April 2020 and pushed Mr. Estenson for some type of commitment from Hub on Plaintiff's future based on coming to the end of his work days.

22. Mr. Estenson assured Plaintiff about Plaintiff's future and after Mr. Estenson's meeting with management in Chicago, Mr. Estenson sent Plaintiff a text message on about April 2018, stating "<u>Your fine Joe, I went through your grandfather in position again a couple week ago and they will continue to honor your pay package until</u>

- 4 -

you retire or quit." Plaintiff believed Hub's promise that he would continue to work for Hub and Hub would continue to honor his compensation pay package until he retired to quit.

23. Plaintiff continued to excel in his sales. All pricing for Plaintiff's sales were done by other Hub employees, Plaintiff had no responsibility or final say on the pricing presented to customers.

24. Upon Plaintiff returning from vacation on November 5, 2018, Mr. Estenson sent Plaintiff a text to call Mr. Estenson. Plaintiff called and Mr. Estenson told Plaintiff that Hub wanted to get rid of Plaintiff, that Hub wanted to pay Plaintiff through December 31, 2018 and would pay Plaintiff's COBRA benefits through June 2019.

25. During their conversation, Mr. Estenson would not answer Plaintiff's questions about why he was being let go and he directed Plaintiff to Brigitte Slaker, VP of Hub's Human Resources.

26. On or about November 12, 2018, Plaintiff spoke with Ms. Slaker and asked why Hub would terminate Plaintiff because he was a top sales producer and pointed out that he had about $32M in sales YTD. Ms. Slaker told Plaintiff that they were looking at it as a retirement, even though at no time had Plaintiff talked to anyone at Hub about retiring. Plaintiff corrected Ms. Slaker and explained he was not retiring. Concerned about losing his job, Plaintiff also asked if he could interview for the new strategy positions or any of the other open sales jobs posted on Hub's website. Ms. Slaker did not respond to Plaintiff.

27. After sending a list of questions about why Plaintiff was being terminated and getting no answers, Plaintiff got a call on about November 12, 2018 from Mr. John Vesco, Executive Vice President, with Ms. Sara Grimaldo, Director of HR also present on the call. Mr. Vesco told Plaintiff he had two choices: (1) sign the separation release and be paid through December 2018 and receive COBRA benefits paid through June 19, 2019,

- 5 -

or (2) do not sign the separation release and today would be Plaintiff's last pay date. Mr. Vesco only gave Plaintiff until 1:00 pm that same day to decide.

28. Plaintiff did not sign the separation release.

29. Plaintiff later spoke with Ms. Grimaldo about why he was being terminated and she emailed Plaintiff on November 15, 2018, and reiterated the termination terms and wrote:

> Tomorrow will be your last day of employment and your benefits will continue through November 30, 2018, after which you could elect to continue coverage under COBRA. Should you choose to sign the attached separation agreement, you will be paid $31,802.59 which equates to 6 weeks and 1 day, or the equivalent of being paid through December 31, 2018. In addition, you would receive company paid COBRA through June 30, 2018 should you chose to enroll. You have 21 days to review and consider this document from today.
>
> . . .
>
> In response to your first question, you are being terminated as part of a restructuring of Hub Group's sales organization. With regards to your second question, you are being terminated tomorrow. You have 21 days to review and consider the agreement. If you sign the separation agreement, you will entitled to the consideration presented in the agreement. If you do not sign the agreement, you will receive nothing further.

30. Plaintiff emailed Ms. Grimaldo asking if Plaintiff was the only salesperson terminated in the restructuring and again pointed out that Plaintiff had sold over $30M YTD in sales. Plaintiff also asked Ms. Grimaldo if he could apply for the sales positions open in this restructure. Ms. Grimaldo did not answer Plaintiff's questions.

31. Plaintiff was terminated on November 15, 2018 at the age of 63 1/2, even though he was one of or the top sales person. Hub retained younger salespeople with lower sales volume, experience, and success

32. Plaintiff was not given any options to transfer to a new position in Hub's restructured sales group and not allowed to apply for any open sales positions. Plaintiff's

sales duties and clients were absorbed by the younger salespeople retained in the restructuring.

33. Hub terminated Plaintiff even though Hub had grandfathered Plaintiff's employment terms and promised to honor Plaintiff's pay package until Plaintiff quit or retired. Based on that assurance, Plaintiff also signed Hub's non-compete agreement, as Plaintiff had intended to work until at least 65 years of age or until April 1, 2020.

34. After Plaintiff's termination, Ms. Grimaldo emailed Plaintiff again on November 27, 2018. Ms. Grimaldo responded and stated that she "will not be responding to questions about the company's decisions."

35. Upon information and belief, Defendant provided severance offers to younger former Estenson employees that included a credit for time employed by Estenson. No such consideration was provided to Plaintiff with regard to the severance package offered to him.

## FIRST CLAIM FOR RELIEF

### (Age Discrimination in Violation of the ADEA)

36. By reference hereto, Plaintiff hereby incorporates all prior paragraphs as if fully alleged herein.

37. Under the ADEA, it is unlawful for an employer to discriminate against the terms and conditions of employment of its employees on the basis of age.

38. The acts and practices of Defendant as alleged herein above, violate the ADEA's age discrimination provisions.

39. Specifically, the decision to terminate Plaintiff, as well as not allowing Plaintiff to either transfer or apply for open positions, retaining less-experienced younger employees with worse performance than Plaintiff, and failing to provide Plaintiff with a severance based on time with Estenson and Defendant offered to younger, former Estenson employees is evidence of age discrimination.

40. In subjecting Plaintiff to different and discriminatory treatment in the terms and conditions of his employment different from younger employees, Defendant willfully and intentionally discriminated against Plaintiff on the basis of age.

41. The reasons provided to Plaintiff for Defendant's actions were merely a pretext for age discrimination.

42. By subjecting Plaintiff to different and discriminatory treatment different than those of younger employees, Defendant discriminated against Plaintiff on the basis of age in violation to the ADEA.

43. As a result of Defendant's discriminatory conduct, Plaintiff has sustained and continues to sustain damages in the form of lost wages, bonuses, commissions and the value of job benefits to be proven at trial.

44. Defendant's actions in violation of the ADEA were willful, thereby entitling Plaintiff to an award of liquidated damages.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

1. For damages for lost and continuing lost wages, bonuses, commissions, and the value of lost job benefits to be proven at trial;
2. Liquidated damages;
3. Attorney's fees;
4. Costs of suit;
5. Prejudgment and post-judgment interest; and
6. For such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

DATED this 4th day of February 2020.

                    **SCHLEIER LAW OFFICES, P.C.**

/s/ Bradley H. Schleier
Bradley H. Schleier
3101 North Central Ave., Suite 1090
Phoenix, Arizona 85012
*Attorney for Plaintiff Joseph A. Sparks*

- 9 -